# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3684-15T1
                A-3711-15T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.K.H. and A.B.G.,

    Defendants-Appellants,

and

T.S.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF A.H., E.L.G. and M.N.G., Minors.

_____

        Submitted June 6, 2017 — Decided  July 19, 2017

        Before Judges Suter and Grall.

        On appeal from the Superior Court of New
        Jersey, Chancery Division, Family Part, Essex
        County, Docket No. FG-07-244-15.

        Joseph E. Krakora, Public Defender, attorney
        for appellant A.K.H. (Deric Wu, Assistant
        Deputy Public Defender, on the brief)

Joseph E. Krakora, Public Defender, attorney for appellant A.B.G. (Charles S. Rosenberg, Designated Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Joseph J. Maccarone, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Karen Ann Lodeserto, Designated Counsel, on the brief).

PER CURIAM

These consolidated appeals are from an April 26, 2016 final judgment of guardianship terminating A.B.G.'s and A.K.H.'s parental rights. Although we conclude the statutory requirements for terminating parental rights, N.J.S.A. 30:4C-15.1(a)(1)-(4), were proven by clear and convincing evidence, we are constrained to remand for compliance with the notice requirements of the Indian Child Welfare Act of 1978, 25 U.S.C.A. §§ 1901-1963 (ICWA).

Part I and II of this opinion address termination. Part III addresses the ICWA.

I.

A.B.G. (Anna) is the mother of A.H. (Abby) born in 2005, E.L.G. (Evan) born in 2006, and M.N.G. (Matt) born in 2007.[1] A.K.H.

---

[1] We use fictitious names for the parties throughout the opinion to maintain their confidentiality.

(Allen) is Abby's and Evan's father. Matt's father, T.S., has not appealed.

A.

On September 3, 2012, Anna learned T.S. sexually abused the children and attacked him with a knife in the apartment they shared. Anna was inebriated. The police responded and arrested her for assault. The Division of Child Protection and Permanency (the Division) removed the children, and following a Dodd hearing,[2] placed them in a resource home where they continue to reside.[3] This was not the first time the Division responded to allegations involving Anna's inebriation, but this was the only one of the many referrals the Division deemed substantiated.

The Division arranged for Dr. Leslie J. Williams to conduct a psychological evaluation of Anna. During this evaluation, she was not "forthcoming about her alcohol history" and denied having a drinking problem. Dr. Williams recommended that Anna obtain stable employment, continue in substance abuse treatment, and

---

[2] The Dodd Act is found at N.J.S.A. 9:6-8.21 to -8.82 (as amended), and provides procedures for emergency removal.

[3] In the Title Nine case arising from the children's removal, Anna stipulated to a finding of abuse and neglect. The Title Nine case was tried against T.S., who was found to have sexually abused the children.

attend individual counseling. He concluded Anna was not then "capable of providing adequate parenting of her children." The Division arranged for her to have supervised visitation with the children. Many of the reports from those visits were positive. She progressed toward recovery in 2012, 2013 and into 2014. By early 2014, Anna progressed to unsupervised visitation.

Anna's progress slowed. Her unsupervised visitation was suspended briefly in February 2014, because she missed a full week of intensive outpatient treatment. In June 2014, her unsupervised visits again were suspended briefly, because she did not report for alcohol screening and was observed coming out of a liquor store, staggering, and appearing to have "urinated on herself." Anna blamed her urination on aggressive questioning by a caseworker.

Despite the setbacks, Anna continued attendance at an intensive outpatient treatment program, and she had unsupervised visitation with the assistance of a parenting aide. Indeed, Dr. Williams conducted a second psychological examination and concluded Anna was "capable of providing adequate parenting of her children."

Unfortunately, Anna relapsed in October 2014. She no longer attended her treatment program, exercised visitation, or

4

maintained contact with the Division. Supervised visitation was reinstituted, but she frequently failed to attend. Anna's inconsistency affected the children. According to the Division's caseworker, when Anna began missing the visits, the children became "frustrated" and did not want to see her. By the caseworker's account, although Anna acknowledged "struggling" and "need[ing] some time to get herself together," she stopped participating in the litigation, had only sporadic contact with the Division, and was not involved in any services.

In May 2015, the Division filed a complaint for guardianship of the children, seeking termination of Anna's, Allen's, and T.S.'s parental rights. In August 2015, the trial court suspended her visitation until "she [was] willing to comply with some services or otherwise to initiate visitation."

In September 2015, Dr. Williams conducted a third psychological evaluation of Anna and a bonding evaluation. Dr. Williams reported:

> [Anna had] been terminated from a number of substance abuse programs; at times starting them and then not continuing in treatment. [Anna] has also not maintained consistent contact with her children. She had been terminated from a visitation program due to nonattendance. [She] had not seen her children for "seven or eight months" at the time of the bonding evaluation . . . . [She] was living alone in an apartment. She was

5

> unemployed . . . . [She] blamed the Division for the children not being returned to her care . . . . [She] stated that she was not like the other people in the programs because she did not have an addiction.

Dr. Williams concluded Anna was "not capable of providing adequate parenting of her children." He recommended it was not in the children's best interests to have visitation with Anna, because "[s]he chose not to visit her children for over six months," and her "inconsistency with visits cause[d] distress in the children who already appear[ed] to be separating from her."

Dr. Williams's bonding evaluation concluded that the resource parent, Ms. Jill,[4] was the "psychological parent" of the children because they exhibited a "firm, positive bond" with her. She had "consistently met their physical and emotional needs." In contrast, the children did not have a "significant positive bond" with Anna. They did not want to live with her. They believed she was continuing to drink alcohol, and at one point during the evaluation they actually "frisked" their mother looking for alcohol. Dr. Williams concluded the children "would not suffer severe and enduring psychological harm" if Anna's parental rights were terminated, but would suffer such harm if removed from Ms. Jill.

---

[4] This is also a fictitious name.

A-3684-15T1

The Division confirmed that Anna was not attending outpatient treatment in October and November 2015 and was terminated from that program. In a December 2015 hearing, counsel for the Division advised the court that the "children continue[d] to express that they do not want contact with their mother." In April 2016, just before trial, Anna tested positive for alcohol.

B.

Allen, the father of Abby and Evan, did not know Anna's first name and referred to her as the "Spanish lady." He did not live with them. Soon after the children were placed in the Division's custody in September 2012, Allen suggested placement of the children with his mother in Tennessee. The Division contacted Allen's mother, but ruled her out for placement because of her health and lack of space. She did not challenge this determination. Allen did not seek custody.

Allen told the Division about an order from 2008 that restrained his contact with Anna. The restraining order allowed for "supervised visits [with the children] only through the court system" and provided a name and contact number for scheduling visitation. The caseworker advised Allen he could address the restraining order with the Union County court. See N.J.S.A. 2C:25-29(d) (authorizing modification on a showing of good cause made

7                                                      A-3684-15T1

to the issuing judge or one who "has available a complete record of the hearing or hearings on which the order was based"). Allen testified at the guardianship trial that he had not seen the children since 2006, two years before entry of the restraining order, and thought he might have exercised visitation under the order just twice. He admitted having no relationship with the children.

The Division arranged a psychological examination for Allen with Dr. Williams in August 2013. He concluded that Allen needed "psychiatric treatment, which should probably include psychotropic medication" because of his "paranoid thinking, poor judgment and self-defeating behavior." The doctor recommended against Allen's visitation with the children because of his "lack of emotional connection" with them and his "persecutory thinking."

Dr. Williams conducted a second psychological evaluation of Allen in 2015. Allen was incarcerated at the time. Dr. Williams concluded Allen appeared "to have a severe psychiatric disorder." He had a "long history of antisocial/criminal behavior." He presented as having "tangential thinking." He "rambled on" and "expressed paranoid ideation about people trying to poison him in jail." Dr. Williams concluded Allen needed "intensive psychiatric treatment including psychotropic medication." Given his

"presentation," he would be "frightening" to the children.  Dr. Williams recommended against visitation as not in the "children's best interests."

C.

Anna did not attend the guardianship trial.  The trial judge entered judgments terminating the parental rights of Anna, Allen and T.S. on April 26, 2016, having placed his reasons on the record earlier.

The judge found the Division caseworkers to be "credible, believable, and . . . honest," and Dr. Williams to be "extremely credible," but did not find Allen's testimony credible because he had "contradicted himself on numerous occasions."

Addressing Allen, the judge found that Allen had been "in and out of jail," had untreated "mental health issues," and had "shown no interest throughout the litigation."  Allen's restraining order permitted supervised visitation, but he chose not to exercise it. The judge found that Allen "is a total and complete stranger" to the children "[a]nd that is harmful to the children."  The judge concluded that "termination of [his] parental rights would not do more harm than good."

With respect to Anna, the trial judge found she had "substance abuse issues" going back eleven years and was "not interested

9

enough to visit her children . . . [or] to be at the trial."  The judge noted she had "three and a half years to get her act together" during the litigation and made some progress, but then "sabotaged" it "by going back to stop her programs."  He found credible Dr. Williams's determination that the children "have been disappointed and hurt by their mother for so long a period of time," and that she had developed "distrust" with them through her substance abuse and noncompliance with services.  The judge relied on the bonding evaluation when he considered that the children were "totally skeptical of everything she told them."  The judge found Anna had "disappeared from her children," she did not "comply with services," and just a few months before trial, she "was still testing positive for alcohol."  The judge found the Division made reasonable efforts, working with Anna for two and a half years, giving her extensions and trying "every which way to try to get her to comply with services."  The court found neither parent was capable of parenting the children and there were no other placement options.

With respect to the resource parent, Ms. Jill, the court found the children "are devoted to her as she is to them."  The children expressed they wanted to stay with her.  The judge found that to "break up this family," referencing the resource parent,

10

"would be absolutely criminal."  The judge rejected the notion that the resource parent was offering to adopt the children for "economic gain."

On appeal, Allen contends that the Division did not make reasonable efforts toward reunification because it did not provide him with visitation based on its misunderstanding of the restraining order.

Anna contends on appeal that the Division failed to show evidence sufficient to terminate her parental rights, contending that each prong of the statutory test was not satisfied. Additionally, she contends the Division failed to comply with the ICWA, requiring a reversal and remand.

We agree with the trial judge that there was sufficient credible evidence in the record to prove by clear and convincing evidence that all four prongs under N.J.S.A. 30:4C-15.1(a) were met, and affirm the order terminating Allen's parental rights. We also find the trial court's conclusions unassailable that the Division proved by clear and convincing evidence all four criteria needed to terminate Anna's parental rights. However, as expressed in this opinion, we remand Anna's case to the trial court to comply with the ICWA.

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)); see also N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007).  Factual findings that are supported by adequate, substantial and credible evidence "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice.'" Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974) (quoting Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App. Div.), aff'd o.b., 33 N.J. 78 (1960)); see also In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (internal citations omitted).  We must accord substantial deference to the findings of the Family Part due to that court's "special jurisdiction and expertise in family matters." Cesare v. Cesare, 154 N.J. 394, 413 (1998).

A parent has a fundamental right to enjoy a relationship with his or her child.  In re Guardianship of K.H.O., 161 N.J. 337, 346-47 (1999).  These rights are not absolute, but are "tempered by the State's parens patriae responsibility to protect the welfare of children." Id. at 347 (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)).  The standard by which the rights of the

12                                    A-3684-15T1

parents and the interests of the State in the welfare of the child are balanced is "through the best interests of the child standard." Ibid. Under that standard, an individual's parental rights may be terminated if the Division establishes all of the following criteria:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a)(1)-(4).]

These factors relate to each other and overlap; they are not "discrete and separate." K.H.O., supra, 161 N.J. at 348. Each prong must be proven by the Division with clear and convincing

13                                                    A-3684-15T1

evidence.  N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012) (internal citations omitted).

A.

Under the first prong, the concern is "whether the parent has harmed the child or may harm the child in the foreseeable future." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 113 (App. Div.) (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986)), certif. denied, 180 N.J. 456 (2004).  In assessing whether the child has been harmed by the parental relationship, "a parent or guardian's past conduct can be relevant and admissible in determining risk of harm to the child."  N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 573 (App. Div. 2010).  The Division must demonstrate "that the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm."  K.H.O., supra, 161 N.J. at 348 (citation omitted).

Anna contends[5] the court erred in finding this prong was satisfied because the Division did not prove the children were

---

[5] We limit our discussion to Anna because Allen did not challenge the judge's finding under the first prong of the statute that he posed a danger to the children because of his lack of a relationship with them, his unaddressed mental health issues, his criminal history and his lack of interest in the litigation. Allen only challenged prong three.

14

harmed or at imminent risk of harm by their parental relationship with her. However, "courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citing A.W., supra, 103 N.J. at 616 n.14).

Anna was suffering from a substance abuse problem, which was not resolved. She had lost her housing and was not employed. She had not been able to overcome her alcohol addiction and this negatively affected her relationship with the children, who distrusted her. Once she relapsed in 2014, she rarely visited with the children and did not contact the Division. Dr. Williams opined that the inconsistency in her visits caused "distress in the children who already appear to be separating from her." Anna offered no expert testimony that her relationship with the children was undermined by anything other than her own conduct. The court did not err in finding prong one was satisfied.

### B.

Under the second statutory prong, the trial court is required to "determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the child[]." A.W., supra, 103 N.J. at 607. "While the second prong more directly focuses on conduct that equates with parental unfitness," prongs one and two

of the best interests standard "are related to one another, and evidence that supports one informs and may the support the other." D.M.H., supra, 161 N.J. at 379 (citing K.H.O., supra, 161 N.J. at 348-49, 351-52). The court considers "whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006) (citing J.C., supra, 129 N.J. at 10), certif. denied, 190 N.J. 257 (2007). "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., supra, 161 N.J. at 379 (citation omitted).[6]

We agree with the trial judge that the Division proved prong two by clear and convincing evidence. Anna only completed successfully one substance abuse treatment program, and was discharged from many others in which she was enrolled. She did not rebut Dr. Williams's conclusion that she was unable to parent the children because of her unresolved substance abuse issues. She remained largely out of contact with the Division and the children. Anna presented no expert testimony that her recovery

---

[6] Allen did not challenge the judge's finding that he abandoned the children through his lack of contact and that this harmed the children.

was "hampered" by the suspension of her visitation with the children.

C.

The third statutory prong requires the Division to show it "has made reasonable efforts to provide services to help the parent[s] correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "'Reasonable efforts' will vary depending upon the circumstances of the removal." N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div.) (citing N.J. Div. of Youth and Family Servs. v. A.G., 344 N.J. Super. 418, 437 (App. Div. 2001), certif. denied, 171 N.J. 44 (2002)), certif. denied, 192 N.J. 68 (2007). The Division's efforts are "not measured by their success." D.M.H., supra, 161 N.J. at 393. Rather, "[t]hese efforts must be assessed against the standard of adequacy in light of all the circumstances of a given case." Ibid.

The court's judgment on the third prong was not in error. Allen was suffering from "a severe mental disorder, schizoaffective[] and delusional disorder." He needed "intensive psychiatric treatment." The doctor recommended against setting up visits with the children because of his psychiatric

17

"presentation." Allen lost contact with the Division. He was in jail and not offering himself as a caretaker. Under these circumstances, the court was correct to find that reasonable services were provided. See N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 242-43 (App. Div. 2010) (rejecting the father's challenge to the lack of services where "he had no relationship with [the child] and could not offer the child permanency," there was "no past parenting of, or relationship with, the child," and the "lack of relationship between father and daughter could not be ameliorated by visitation or services because [he] remained incarcerated throughout the litigation"), certif. denied, 205 N.J. 219 (2011).

Anna was provided with multiple psychological evaluations, "a substance abuse evaluation, multiple referrals for substance abuse treatment[,] . . . transportation assistance, supervised visitation, therapeutic visitation, [and] unsupervised, overnight visitation." She was provided with a parenting aide during unsupervised visitation. There was no error by the trial court in finding that the Division provided reasonable services to Anna to assist her in overcoming the reasons for termination.

The record does not support Anna's allegation on appeal that visitation was suspended improperly. Rather, the record supports

that it was suspended because of her lack of cooperation with services and loss of contact with the Division. Moreover, aside from her unsupported allegation that the resource parent discussed Anna's substance abuse problem with the children on one occasion, there was no actual proof this occurred or that it undermined Anna's relationship with the children.

### D.

The fourth statutory prong requires the trial court to balance the harms suffered from terminating parental rights against the good that will result from terminating these rights. K.H.O., supra, 161 N.J. at 363; A.W., supra, 103 N.J. at 610-11. It does not require a showing that "no harm" will result from the termination of parental rights, but involves a comparison of the child's relationship with the biological parent and the foster parent. K.H.O., supra, 161 N.J. at 355. Thus, "[t]he question to be addressed under [the fourth] prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid.

Allen does not contest the court's finding that termination of his parental rights "would not do more harm than good" because

he was a "stranger" to the children, who did not know him.  The court found that "it would not be safe for him to have had visitation with them or to have any contact with them" because of his mental health issues.  These findings were amply supported by the testimony of the Division's expert who testified the children had not mentioned their father, they did not interact with him, and there would be no severe and enduring harm to the children if his parental rights were terminated.

Similarly, the trial court's conclusion that termination of Anna's parental rights would not do more harm than good was supported by the testimony of Dr. Williams, who reached this opinion based on Anna's lack of relationship with the children in the last year before trial and their expression that they did not want to live with her.  The children are bonded with the resource parent who also wants to adopt them.  They do not recognize Anna as their psychological parent.

Anna does not contest this finding either factually or through expert testimony, protesting instead in this appeal that we simply should direct the Division to stop suspending visitation between foster children and their parents except after an evidentiary hearing.  We decline to address this issue, where there was no objection by counsel when the orders suspending visitation were

20

entered, and which was not raised before the trial court. See State v. Witt, 223 N.J. 409, 419 (2015) ("[W]ith few exceptions, 'our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.'" (quoting State v. Robinson, 200 N.J. 1, 20 (2009))).

Having satisfied all four prongs of N.J.S.A. 30:4C-15.1(a), for both parents, there was no error by the trial judge in entering the judgment terminating Allen's parental rights, and should the children not be "Indian" children under the ICWA, in terminating Anna's parental rights.

### III.

We turn to address Anna's claim under the ICWA.[7] The Supreme Court and this court have discussed the ICWA's purpose and application in cases involving termination of parental rights. Matter of Adoption of a Child of Indian Heritage, 111 N.J. 155 (1988) (hereinafter Child of Indian Heritage); N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363 (App. Div. 2015). In order to preserve the "continued existence and integrity of

---

[7] The Division's motion to supplement the record on this point was denied without prejudice to renewal before the panel deciding the appeal. The Division included the supplemental materials in its appendix. No party objecting, we sua sponte grant leave to supplement and consider the materials.

Indian tribes," Child of Indian Heritage, supra, 111 N.J. at 166, "tribes have a right to intervene" in a court proceeding involving termination of parental rights.  K.T.D., supra, 439 N.J. Super. at 369.  To facilitate exercise of the right, the ICWA requires notice.  Ibid. (discussing 25 U.S.C.A. § 1912(a)).  The obligation to give notice is triggered when "a state court knows or has reason to know that the child involved is an 'Indian child.'"  Ibid.

A child is an "Indian child" when the child is either: "(a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  25 U.S.C.A. § 1903(4).  "Tribes have different criteria" to determine who can be a member and have "exclusive authority" over that determination.  K.T.D., supra, 439 N.J. Super. at 369-70.

Under the regulations in effect at the time of the guardianship trial, the Division, as the "party seeking" termination, was obligated, if known, to "directly notify the Indian parents, Indian custodians, and the child's tribe by certified mail with return receipt requested, of the pending

proceedings and of their right of intervention."  25 C.F.R. §

23.11(a) (2014).[8]

"The BIA has issued guidelines to assist in interpreting the

ICWA."  K.T.D., supra, 439 N.J. Super. at 371.[9] Per the Guidelines,

"[i]f there is any reason to believe the child is an Indian child,

the agency and State court must treat the child as an Indian child,

unless and until it is determined that the child is not a member

or is not eligible for membership in an Indian tribe."  Guidelines,

supra, 80 Fed. Reg. at 10,152.  The court is to confirm that the

Division made "active efforts" to work with the tribes to verify

if the child may be eligible for membership.  Ibid.

Anna initially asserted the ICWA did not apply to her.

However, her amended birth certificate provided:

> Mixture of English, Negro, and Indian blood.
> Indian can be traced from my grandmother,
> Willie Ann Ellison, born in Lauderdale County,
> Mississippi, in the 1860s. My mother, born

---

[8] If the tribe cannot be identified, the Bureau of Indian Affairs
(BIA) must be contacted.  See 25 U.S.C.A. § 1912(f).

[9] See Guidelines for State Courts and Agencies in Indian Child
Custody Proceedings, 80 Fed. Reg. 10,146 (Feb. 25, 2015),
https://www.federalregister.gov/documents/2015/02/25/2015-
03925/guidelines-for-state-courts-and-agencies-in-indian-child-
custody-proceedings (Guidelines).  These Guidelines were revised
in December 2016, which was after the guardianship trial.

same place, 1913, August Rush. Grandfather is
Mose Rush, born same place, about 1870.[10]

On March 8, 2016, the Division sent certified letters to the BIA and the Department of the Interior to determine whether the ICWA applied to this proceeding. On March 29, 2016, the BIA responded that it did not maintain such information and advised the Division to obtain it "from the tribe itself, if tribal affiliation can be determined."

On April 8, 2016, the Division sent a letter to the eight federally recognized Apache tribes,[11] advising them of Anna's amended birth certificate. Five tribes responded after the guardianship trial was completed and indicated that Anna and the children were not eligible for tribal membership. Neither the BIA nor the tribes requested additional information.

Post-termination orders included in the supplemented record, which were entered in proceedings conducted under docket numbers FC-07-159-13, FC-07-160-15 and FC-07-162-13, determined that the

---

[10] It is unclear when the Division acquired this amended birth certificate; it is not included in the trial record or the record as supplemented on appeal.

[11] According to the Division, T.S., Matt's father, had suggested at some point that Anna "might have Apache heritage." He claimed to have heritage as a Blackfoot Indian, but the Division contacted the Blackfoot tribes and did not receive any response indicating that T.S. or his relatives were enrolled members of any tribe.

ICWA did not apply to Anna's children.  Anna, however, was not a party to those proceedings.[12]

There was no objection at trial by the Law Guardian for the children or Anna's counsel to the content of the notices provided, the timing of the trial, or the tribes that were contacted.  The tribes have not asked to intervene, to vacate the judgment or for additional information.

Anna suggests the Division had an obligation affirmatively to contact other tribes based on census data from 1880 and 1910 involving two of the relatives identified in the amended birth certificate.  She contends the notices were not consistent with the applicable regulations, see 25 C.F.R. § 23.111 (2016),[13] and that the court erred in proceeding with the guardianship trial prior to the tribes responding.

These issues are raised by Anna for the first time on appeal.  Although we generally decline to address issues that were not raised before the trial court, see Witt, supra, 223 N.J. at 419, we do so here because of the unique issues presented by the ICWA.

---

[12] None of the parties provided a record of the proceedings.

[13] 25 C.F.R. § 23.11 was amended on June 14, 2016 to include reference to 25 C.F.R. § 23.111, which was added as part of the amendments and lists everything that the Division must now include in the notice.  81 Fed. Reg. 38,778 (June 14, 2016).

The Division concedes that the notice requirements of the ICWA were triggered by a copy of Anna's "amended birth certificate," but "asserts that it made the appropriate efforts upon determining that [Anna] might have Native American ancestry and that the proceeding below was not adversely affected." We are constrained, however, to remand Anna's case to the trial court for compliance with the ICWA regulations.

The Division's notices to the BIA and the Apache tribes did not include all the information required by the regulations. Specifically, the notices did not include the children's birthplace, Anna's former addresses, aliases or birthplace, or any information about the fathers. 25 C.F.R. § 23.11(d)(1), (3) (2014). The amended birth certificate gave limited information about ancestors. 25 C.F.R. § 23.11(d)(3) (2014). A copy of the guardianship complaint was not included. 25 C.F.R. § 23.11(d)(4) (2014). The notice did not say the case involved termination of parental rights, the phone number of the court was omitted, and the notice did not advise the tribes they could ask to transfer jurisdiction. See 25 C.F.R. § 23.11(e) (2014). Although the regulation required the notice to provide only such information as is known, the Division did not say that all or some of these items were unknown.

We recognize that none of the responding tribes have asked for additional information, nor has Anna or the Law Guardian presented any new information about the children's alleged Indian heritage. However, we cannot say the additional information required by the regulation might not have prompted further inquiry.

The Division is to send new notices consistent with the applicable regulation. See 25 C.F.R. § 23.111 (2016).

The Division also should make efforts to identify if other tribes should be notified, and then to provide them with notices compliant with the regulation. The post-judgment orders entered under the FC dockets are not before us on this appeal. Nevertheless, as a party to this appeal, the Division is bound by this opinion in any further proceedings in this matter. See, e.g., Eherenstorfer v. Div. of Pub. Welfare, 196 N.J. Super. 405, 411 (App. Div. 1984).

Seeing no reason to deviate from the course we took in K.T.D., supra, 439 N.J. Super. at 373, we direct the trial court to ensure that conforming notices are sent forthwith. The guardianship judgments shall be deemed affirmed after service of conforming notice if: (1) no tribe responds to the notices within the time provided under the ICWA; (2) no tribe determines within the time allotted under the ICWA that the children are Indian children

defined by the ICWA; or (3) the court determines, after the tribes have been given an opportunity to intervene, that the ICWA does not apply. If the children or any one of them is determined to be an Indian child under the ICWA, the judgment terminating Anna's parental rights shall be vacated and further proceedings consistent with the ICWA should be held.[14] See ibid. These proceedings shall be expedited.

While seemingly a technicality, the ICWA has significant implications. Once a child is determined to be an Indian child, proof beyond a reasonable doubt is required. Id. at 370 (citing 25 U.S.C.A. § 1912(f)). Moreover, under 25 U.S.C.A. § 1914, if an Indian child is the subject of a termination of parental rights proceeding, the child's Indian parent or the tribe itself, "may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections [25 U.S.C.A. §§ 1911, 1912 or 1913] of" the ICWA. These proceedings shall be expedited.

Affirmed in part; remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

---

[14] Allen did not appeal on this issue. However, to the extent a judgment of guardianship requires termination or surrender of both parents' rights, his are implicated.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3684-15T1